IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>INFORMATION ASSOCIATED WITH<br>**guptamd@gmail.com,**<br>**User Name: Manish Gupta,**<br>THAT IS STORED AT PREMISES<br>CONTROLLED BY DROPBOX INC. | Case No. 3:20MJ5085 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Erin L. Marciniak, being first duly sworn, hereby deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Dropbox.Com, a provider headquartered at 333 Brannan Street, San Francisco, CA 94107.  The information to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Dropbox.Com to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      Affiant is a Special Agent of the Federal Bureau of Investigation (FBI), employed by the Unites States Department of Justice.  I have been a Special Agent of the FBI since 2004 and am currently assigned to a Health Care Fraud and White Collar Crime Squad.  Prior to 2004, I was an Assistant State's Attorney for Cook County, Illinois, prosecuting both criminal and civil matters.  I received specialized training in search and seizure procedures as well as the execution of arrest warrants.  Through my training and experience, I have gained knowledge and guidance from other agents and law enforcement officers regarding investigations as it pertains specifically to sex crimes.

3.      Pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), this affidavit is made in support of an application for a warrant to search the following:

      a.      Information associated with a certain account that is stored at the premises owned, maintained, controlled, or operated by Dropbox, a provider headquartered at 333 Brannan Street, San Francisco, CA 94107.  The account to be searched is Dropbox User IDs:

**Email: guptamd@gmail.com**
**Name: Manish Gupta**

4.      Pursuant to 18 U.S.C. § 2703(f), a preservation request was submitted for this account on or about March 6, 2020.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1591(a), sex trafficking by force, fraud, or coercion, and 21 U.S.C. § 841(a)(1), illegally dispensing controlled substances, have been committed by Manish Gupta.  As set forth in greater detail below, there is also probable cause to search the information described in Attachment A, specifically the Dropbox account Guptamd@gmail.com, User Name: Manish Gupta, hereinafter referred to as DROPBOX ACCOUNT, for evidence of these crimes, more particularly described in Attachment B.

6.      The statements in this affidavit are based upon my investigation, information provided by other law enforcement officers, and on my experience and training as a Special Agent of the FBI.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence and instrumentalities of the violations of federal law committed by Manish Gupta are located in the subject Dropbox account.

## BACKGROUND INFORMATION AND DEFINITIONS

7.      This investigation involves a doctor, MANISH RAJ GUPTA (hereinafter "Gupta"), who illegally administered narcotics to prostitutes who were not his patients and had no knowledge of it, and then video-recorded sex acts he committed on these women after he drugged and/or rendered them unconscious.  Some of Gupta's recordings were initially

discovered on SD cards (i.e. external media devices), which were then copied onto four different USB flash drives or thumb drives and turned over to the FBI.  These external media devices are data storage devices that are typically removable, rewriteable, and used to transfer information.  The most common use of external storage media, including flash or thumb drives, is to transport and store personal files, such as documents, pictures and videos.

8.      Individuals who record sex acts with others can transfer photographs from a camera onto a computer-readable format with a device known as a scanner.  With the advent of digital cameras, including those incorporated in cellular telephones, the images can also be transferred directly onto a computer.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.

9.      The computer's ability to store images in digital form makes the computer itself an ideal repository for obscene images which can easily be transferred to a minor.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.  Cellular telephones are likewise capable of the storage and transportation of obscene material, and can easily be used, through the use of applications like Kik and ooVoo, to communicate with persons with some degree of anonymity, and to harass and intimidate persons through the content of messages, including images and videos.

10.     The Internet and its World Wide Web afford persons who are sexually motivated, or who simply wish to transfer obscene material or recorded sex acts, almost unlimited opportunities to communicate in a relatively secure and anonymous fashion, and to transfer to them images or videos of material of their choosing.

11.     Individuals can also use online resources to retrieve and store pornographic images, including services offered by internet portals such as ooVoo, Kik, Dropbox, or Yahoo!, among others.  The online services allow a user to setup an account with a remote computing service that provides email or other messaging services as well as electronic

3

storage of computer files in a variety of formats.  A user can set up an online storage account from any computer or cellphone with access to the internet.  Evidence of such online storage of recorded sex acts is often found on the user's computer or cellphone. Even in cases where online storage is used, however, evidence of images an videos of such recorded sex acts can be found on the user's computer or cellphone in most cases.

12.     As is the case with most digital technology, communications by way of computer or cellular telephone can be saved or stored on the computer or cellular telephone used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer (or telephone) or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains particular software or "applications," when the computer or cellular telephone was being used to communicate with other persons, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

13.     For the purpose of this affidavit, unless otherwise specifically indicated, the term "computer" refers to the box that houses the central processing unit (CPII), along with any internal storage devices (such as internal hard drives) and internal communications devices (such as internal modems capable of sending/receiving electronic mail or fax cards) along with any other hardware stored or housed internally.  Thus, "computer" refers to hardware, software and data contained in the main unit.  Printers, external modems (attached by cable to the main unit), monitors, and other external attachments will be referred to collectively as peripherals and discussed individually when appropriate.  When the computer and all peripherals are referred to as one package, the term "computer system" is used.  Information refers to all the information on a computer system including both software applications and data.

4

14.     The term "computer hardware," as used in this affidavit, refers to all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  Hardware includes (but is not limited to) any data processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices, transistor-like binary devices, and other memory storage devices, peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys, locks, and dongles).

15.     The term "computer software," as used in this affidavit, refers to digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

16.     Based upon my knowledge, training and experience, and the experience of other law enforcement I know, the internet is a worldwide computer network that connects computers, including cellular telephones, which constitute computers, and allows communications and the transfer of data and information across state and national boundaries.  Individuals who utilize the Internet can communicate by using electronic mail (hereafter referred to as "email").  E-mail is an electronic form of communication that can contain letter type correspondence and graphic images.  E-mail is similar to conventional paper type mail in that it is addressed from one individual to another and is usually private.  E-mail usually contains a message header which gives information about the individual who originated a particular message or graphic, and importantly, the return address to respond to them.

17.     Visual depictions and graphic files referred to below are in the form of "computer graphic files."  Computer graphic files are photographs or other visual depictions that have been digitized into computer binary format.  Once in this format, graphic files can be viewed, copied, transmitted, and/or printed.  Computer graphic files are differentiated by the type of format convention by which they were created.  Examples of image computer file extensions, which represent different format conventions, are "jpg," "gif," "mpg," and "avi."

18.     "Internet Protocol (or simply IP) address" refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might be static whereby the user's ISP assigns his computer a unique IP address - and that same number is used by the user every time his computer accesses the Internet.

19.     The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic, optical, or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard drives, CD-ROMs, digital video or versatile disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory cards/sticks, optical disks, flash (thumb) drives, printer buffers, smart cards, memory calculators, electronic dialers, cell phones, gaming consoles, or electronic notebooks, as well as digital data files and printouts or readouts from any electrical, electronic, optical, or magnetic storage device).

20.     "URL" or "Uniform Resource Locator" refers to Internet addresses.  Each website on the Internet has a unique address called a Uniform Resource Locator, more commonly known as URL.

## <u>CHARACTERISTICS OF INDIVIDUALS WHO RECORD SEX ACTS</u>

21. Based upon my own experience and what I have learned from other individuals who specialize in sex crimes, individuals who engage in recorded sex acts are likely to keep a collection of these recordings close and readily accessible to them, whether in their home, workplace, vehicle, or on their person.  The recordings themselves fuel the individual's sexual interests, and by recording the events, the individual can re-watch them repeatedly for their own sexual gratification.  With the growth of the Internet and computers, a large percentage of such collections today are in digital format.

22. The majority of individuals who engage in recorded sex acts rarely, if ever, dispose of such material and may go to great lengths to conceal and protect this illicit material from discovery, theft, and damage.  This may include saving the files to folders that are deceptively named to conceal their real content, transferring them to external storage media devices, saving them in locations unknown to family and friends, and/or moving them from one location to another to avoid detection.  They do this because they value their materials due to the difficulty, and legal and social danger, associated with creating or acquiring them.  As a result, it is not uncommon for collectors to retain images, videos, or other recordings of their recorded sex acts for long periods of time, even for years.

23. Such individuals may maintain their collections in both online and offline storage media, even as they relocate from one residential or work address to another.  Because of the increasingly small size of computers, such as cell phones, SD cards, and thumb drives, computers have become increasingly mobile and thus, it is not uncommon to find recordings of sex acts on various mobile devices, which can go wherever these individuals go, copied from one medium to another, and stored digitally in many accounts and on many devices simultaneously.  With the advent of the Digital Age, collectors are also able, and more likely, to keep their collections on external storage media and digital repositories like Dropbox or other cloud storage accounts (see definitions below) that are also accessible wherever they go, be it at home, work, their vehicle, or even on their person as they move from one location to the next.

24. Such individuals who record sex acts on electronics devices will have the recorded material in digital form for as long as the material is not deleted.  That is, the material

7

itself is not perishable and can be transferred from one electronic device to another, and/or from an electronic device to cloud storage.

25.     More and more, people are using the cloud as an alternative off-site storage location for digital content.  Many electronic service providers now provide cloud storage as an additional location for off-site digital content, which enables the material to be readily accessible to such individuals without being physically located on any of the individuals' electronic devices, thus providing cover for surreptitious criminal acts and the digital recordings of that criminal conduct.  The cloud also provides virtually unlimited storage capacity, which smaller electronic devices may lack, making it an ideal repository for the storage of larger digital files, like longer recorded videos, or illegal content.

## CLOUD STORAGE AND DROPBOX

26.     Cloud computing has become an increasingly popular way for both individuals and businesses to store and maintain data.  Cloud computing utilizes computer resources delivered as a service over a network (typically the Internet).  Resources are distributed across a variety of remote data centers in different locations.  The following terms relate to the use of cloud computing:

a.      "Cloud" is a generic term that refers to a network where the physical location and inner workings are abstracted away and unimportant to the usage.  "The cloud" was first used to describe telecommunication networks, where the consumer was unaware of the inner workings of how their telephone conversation was transmitted to the remote end. The term was later used to describe computer networks, and ultimately to describe the Internet specifically.  Knowing the physical location of a website is unimportant to using that service.  Cloud computing also takes advantage of this definition of cloud as it is also a service connected to a network, often the Internet.  However, cloud computing offers specific services whereby customers rent remote computing resources such as processing power or data storage, and provision those resources themselves.

b.      "Cloud computing" is a model for enabling ubiquitous, convenient, on demand network access to a shared pool of configurable computing resources (e.g. networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction.

8

c.      "Cloud Service Provider" (CSP) is the entity that offers cloud-computing services. CSP's offer their customers the ability to use infrastructure, platform, or software as a service.  These services may include offerings such as remote storage, virtual machines, or Web hosting.  Service is billed as a utility based on usage.  CSP's maintain records pertaining to the individuals or companies that have subscriber accounts with it.  Those records could include identifying and billing information, account access information in the form of log files, account application information, and other information both in computer data format and in written record format.  CSP's reserve and/or maintain computer disk storage space on their computer system for the use of the cloud service subscriber for both temporary and long-term storage of electronic data with other parties and other types of electronic data and files.  Such temporary, incidental storage is defined by statute as "electronic storage," and the provider of such a service is an "electronic communications service" provider.  A cloud service provider that is available to the public and provides long-term storage services to the public for electronic data and files, is providing a "remote computing service."  CSP's may be able to provide some of the following, depending on the type of services they provide:  NetFlow, Full Packet Captures, Firewall and Router Logs, Intrusion Detection Logs, Virtual Machines, Customer Account Registration, Customer Billing Information.

d.      'Virtual Machine" (VM) is a system where the hardware is virtual rather than physical.  Virtualization is a technique whereby special software, called the hypervisor, can run many virtual (rather than physical) machines.  The hardware on the single machine is emulated so that each virtual instance of a computer, called a VM, does not require dedicated physical hardware, but each VM believes it has its own hardware. The hypervisor has special access to control all of the virtual guests, but it should also be able to isolate the guests from each other.

e.       'NetFlow Records" are collections of network statistics collected by a service provider about traffic flows. A traffic flow is a sequence of data packets from a source to a destination.  NetFlow is collected when it is impractical to collect all of the data packets for a flow. Providers may use these logs for quality control, security, or billing. For any particular network flow, NetFlow can include the source and destination Internet Protocol

9

(IP) addresses, network ports, timestamps, and amount of traffic transferred.  A provider may only collect a sample of all possible sessions, and may only store the NetFlow for a short time.

27.     Dropbox is a service that allows its users to store files on Dropbox's servers.  According to Dropbox's privacy policy, at https://www.dropbox.com/privacy, Dropbox collects and stores "the files you upload, download, or access with the Dropbox Service," and also collects logs: "When you use the Service, we automatically record information from your Device, its software, and your activity using the Services. This may include the Device's Internet Protocol ("IP") address, browser type, the web page visited before you came to our website, information you search for on our website, locale preferences, identification numbers associated with your Devices, your mobile carrier, date and time stamps associated with transactions, system configuration information, metadata concerning your Files, and other interactions with the Service.

28.     The Dropbox Law Enforcement Handbook also states that Dropbox maintains IP addresses for web-based logins and the last-seen IP address of linked computers' IP address information is typically maintained for 6 months, but this may be extended with a preservation request.  IP addresses of specific actions within a Dropbox account, such as uploads and deletions, maybe available.  IP address login information is recorded when a user logs in to Dropbox through the website.  Like many online services, Dropbox sometimes uses cookies stored on a browser so that a user may not need to sign in every time they visit the website.  Additionally, if a user is accessing files in their Dropbox account from a desktop or mobile application, that access may not be logged by Dropbox.

29.     In general, providers like Dropbox ask each of their subscribers to provide certain personal identifying information when registering for an account.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number).  Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of

10

service, records of log-in (i.e. session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, providers often have records of the IP addresses used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

30.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## PROBABLE CAUSE

31.     Gupta is a medical doctor licensed by the State of Ohio and Michigan.  He is a board-certified plastic surgeon by the American Board of Plastic Surgery.  His National Provider Identifier ("NPI") number is 1124005863.  Manish Raj Gupta is registered with the Drug Enforcement Agency (DEA), license number BG6536809.  He is the current owner of three medical offices, two of which are in Ohio:  Artisan Cosmetic Surgery at 7634 W. Central Ave., Toledo, OH and 1050 Isaac Streets Drive, Oregon, OH in the Northern District of Ohio, Western Division.[1]  He resides at 2522 Waterford Village Drive in Sylvania, OH, also in the Northern District of Ohio, Western Division.

32.     As a doctor, Gupta is authorized to order and prescribe schedule II, III, IV and V narcotics or controlled substances.[2]  The Controlled Substances Act ("CSA") makes it "unlawful for any person knowingly or intentionally" to "distribute or dispense a controlled substance" or conspire to do so.  A doctor violates the CSA and Code of

---

[1] His third medical practice is in Wayne County, Michigan.

[2] The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, and V.

11

Federal Regulations if he dispenses a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose. Such an order is "not a prescription within the meaning and intent of the CSA," and knowing and intentional violations subject the doctor to criminal liability.

33.     In January 2019, Affiant began investigating Gupta for allegations that he improperly drugged and then performed sex acts on victim "KB" in 2016. "KB," an adult female, worked as a high-end escort who provided companionship and engaged in sexual activity to individuals willing to pay. The information was submitted via email from motorcitygent@gmail.com and identified the following personal data: Name: Manny Gupta; Age: 45; Email: motorcitygent@gmail.com; Cell Phone: 313-444-5620; City you live in now: Sylvania; Location of our date: Ritz Carlton DTLA (Downtown LA); Day and Time of our date: Sept. 21, 2016 7pm; Length of date desired: overnight; Employment Info: Doc.

34.     Multiple email exchanges occurred from August 9, 2016 through September 23, 2016 to arrange the logistics, including the location, length and payment of the date. Gupta advised of his sexual desires, which included role play with sex toys, blindfold, anal sex, clothing requests, and his request to videotape it. KB advised Gupta that she did not consent to his request to record, replying "No video or photography, I'm afraid. My privacy is paramount. And I won't be comfortable with being filmed under any circumstances, not even with a mask."

35.     KB met Gupta on September 23, 2016 at the JW Marriott in Los Angeles, CA. Records obtained confirm that Gupta stayed at The Ritz Carlton in Los Angeles from September 21-26, 2016.[3] Gupta informed KB that he was in town for a plastic surgery convention. Individuals familiar with Gupta's practice advised that Gupta had them ship a medical bag to the hotel where he was staying in advance of these conferences, which he then shipped back to his Toledo office after the conference. Fed Ex shipping records confirm that there were two shipments by Gupta from the Fed Ex shipping center at 3333 South Grand Avenue, Los Angeles, CA 90007, to Toledo, Ohio on September 26, 2016.

---

[3] In Los Angeles, the Ritz and JW Marriott are adjoining hotels, operated by Marriott International, Inc.

36.     KB performed consensual oral sex on Gupta in his hotel room before dinner.  After dinner, Gupta recommended another bar but the lines were long so they returned to the hotel.  Once KB was alone with Gupta in his hotel room, Gupta requested that she stand on a table, turn away from him, and slowly take off her clothing.  KB believes Gupta could have been recording her because he demanded she do it so many times and because it involved having her back to him.  Gupta then told KB to get changed into the lingerie he asked her to wear and he poured each of them a glass of Prosecco.

37.     After KB sipped out of the glass Gupta gave her, Gupta told her to insert anal beads and then told her to remove them.  KB had consented to anal sex but she did not consent to being drugged by Gupta, nor was she notified by Gupta at any point that she was going be administered a drug.[4]  After removing the anal beads, she had little recollection and believes she was drugged to the point of unconsciousness.  She awoke in the morning, believing she had been drugged, and left the room while Gupta was in the bathroom.

38.     KB drove to the residence of another client who was an anesthesiologist.  He purchased an at-home drug test for KB to take, for which KB provided a urine sample.  It tested positive for a Benzodiazepine.  KB did not know what a Benzodiazepine was or the reason for taking a Benzodiazepine until she looked it up online.[5]

39.     KB went to the Rape Treatment Center at Santa Monica/UCLA Medical Center and underwent a rape exam in which vaginal, anal, and other swabs were taken from her.  KB provided them with the urine sample she had previously taken and the Rape Treatment Center advised they would store it, in addition to the swabs.  KB was advised that the results of her rape kit would be held as evidence for up to seven years or until she was ready to press criminal charges.  KB did not report the matter to law enforcement at that time.  Affiant obtained the records from the Rape Treatment Center as part of this investigation.

40.     As a result of what Gupta had done to her, KB went on different websites (SafeOffice.com and Verifyhim.com), which are verification tools for women to stay safe

---

[4] or being recorded during commission of sex acts.

[5] She had smoked marijuana early in the day, before meeting Gupta, but had not used any other drugs.

in the world of dating online and where escorts and other women can share information about men who are dangerous.  It was then that she learned she was not the first victim to have been drugged, raped, and likely video-recorded by Gupta.  Multiple complaints dating from March 2013 through September 2016 identify Manish Gupta or "Dr. G" as a plastic surgeon from Toledo, Ohio, telephone number 419-482-8343 or 216-255-8160 as "Very Dangerous," "Drug User/Drug Present," "raped me during date…he also recorde [sic] a video."  Another stated, "Dr. Manish Gupta (www.artisancosmeticsurgery.com) drugged me during a date, raped me and recorded all this terrible even on video.  His medical license should be suspended."

41.  In 2013, a telephone call came in to Artisan Cosmetic Surgery.  The caller was female with a foreign accent, stating that Gupta had drugged her, raped her, and video-recorded her.  The caller was able to accurately describe Gupta's wooden cellphone case, which had an inscribed Artisan Cosmetic Surgery logo on it, and she correctly described his vehicle as a blue Maserati.  One of Gupta's employees later relayed the information to Dr. Gupta while he was sitting in his office.  Gupta's response was that the woman was just trying to get money from him.  According to the employee, many of the other employees in the office learned of this phone call as well.

42.  Dr. Gupta regularly used a "black Allergan bag" from the manufacturer of breast implants to transport supplies for Botox parties and into the hospitals for breast augmentations or reconstructions.  At some point, the bag went missing and different employees were looking for it to prepare for events.  The black bag was assumed to have been lost until sometime in late 2013 when several employees were sitting in the office, which housed three different work desks and a tall wooden bookshelf, and one of them noticed the bag on the very top of the bookshelf.  The employees were expecting it to be empty, as they would clear out all the unused supplies after it was returned to the office.  However, when they opened the bag, they found multiple sex toys, anal lubricant, large plastic syringes, empty anesthesia bottles, women's lingerie, a blindfold, a tripod with a possible camera, and narcotics, including Ketamine, Benzodiazepines, Valium suppositories, and Versed.  Some of the vials found inside the bag were identical to the

14

narcotics used in Gupta's practice at Artisan Cosmetic Surgery.  Some of the employees took photographs of the contents of the bag.

43.    In late 2014, another employee[6] subsequently found in Dr. Gupta's desk what was originally described as 10-20 thumb drives, but which was corrected to be SD cards.  An employee later copied the contents of the SD cards onto thumb drives.  The content depicted several videos of Gupta having sex with women—specifically women who appeared to be unconscious or rendered unconscious during filming and whom the employee described as being escorts.  Another video showed a tube of lubricant with a woman who was conscious, after which the video turned off, and when it started again, the same woman appeared to be unconscious and non-responsive as Gupta had sex with her.

44.    After seeing the videos, the employees became scared and did not know what to do with this information.  After the business relocated to Central Avenue in 2015, a new "white box" or external hard drive existed wherein employees believed all images captured on the SD cards were downloaded and stored.  One employee, intended on using this information to extort money from Gupta but denied going through with it, later gave the thumb drives to another individual who in turn, provided them to the FBI.

45.    On December 30, 2019, I obtained a federal search warrant for the thumb drives.  They contained five different videos of Gupta engaging in sex acts with four different unconscious women.  The videos depict at least three different cameras, some of which are in the shape of a small tripod, on top of furniture in the room, including but not limited to bedside tables.  In all of the videos, Gupta appears naked and with an erect penis.   Gupta's face is visible to the camera at various points during the recordings, as he positions and re-positions cameras, as well as engages in sex acts.  The women in the videos all have their genitalia exposed as they lie on the bed and appear largely motionless unless physically moved by Gupta himself.  All but one of the women are wearing black hosiery, black heels, and/or dark corsets, consistent with the attire that Gupta told KB to wear.  In at least one recording, Gupta's medical bag, which was

---

[6] Whose identity is known but not disclosed in order to protect that individual.

15

routinely shipped to conferences, can be seen on a desk and at one point during the recording, he reaches into the bag to retrieve cameras.  At another point in one of the recordings, Gupta is seen inserting an anal lube shooter into an unconscious female.

46.     The State of Ohio Board of Pharmacy conducted a routine audit of controlled substances at the Artisan Surgery Center at 7634 West Central Avenue (Toledo) on January 20, 2016, eight months before Gupta drugged, raped, and recorded KB.  The inspection revealed multiple violations for which warnings were issued.  Gupta's practice had failed to properly complete the necessary DEA forms when drugs were delivered to the practice, it had failed to maintain a record of the identification of the individuals who prescribed, administered, dispensed, and/or wasted or destroyed narcotics, and it had failed to complete an annual inventory of controlled substances that included all information required by Ohio Administrative Code 4729-9-14.

47.     The Pharmacy Board conducted another audit of controlled substances at the Artisan Cosmetic Surgery Center at 7634 West Central Avenue (Toledo) on December 17, 2019, and found that Gupta failed to have adequate systems in place to detect and deter drug diversion.  Although there was an inventory of controlled substance administrations and destructions/wastes maintained in the office, it did not include records for Ketamine or Diazepam/Valium, which were observed on-site.[7]  Like in 2016, it found that DEA forms were not properly completed when drugs were received, including documenting the quantity and date of receipt, there was no record of the identification of individuals responsible for the acts of prescribing, administering, dispensing, and wasting controlled substances, and no annual inventories had been done of controlled substances in 2017 or in 2019.  Ketamine and Diazepam/Valium were omitted from the annual controlled substance inventories that had been done for 2015, 2016, and 2018.

48.     The Pharmacy Board sought and obtained records from the drug distributors themselves for all purchases made between December 1, 2016 and December 31, 2019 under Gupta's DEA number or his facility's DEA number, and cross-referenced those to Gupta's office-

_____

[7] Ketamine is a Schedule III drug used to assist anesthesia that induces a trance-like state while providing pain-relief, sedation, and memory loss.  Diazepam/Valium is a Schedule IV benzodiazepine used for anxiety.

provided records of accountability regarding drug administrations, returns, and destructions.  Gupta's records did not match the audit results.  Significant, unaccounted-for losses of drugs were identified, including Ketamine, Diazepam/Valium, Fentanyl, and Morphine.  In addition, the Pharmacy Board audit revealed that Gupta had received a shipment of Ketamine on September 12, 2016, just two weeks before he drugged KB.

49.  According to employees interviewed during the course of the investigation, in late 2017 or early 2018, a large shipment of Ketamine was attempted to be delivered to Gupta on a Saturday afternoon.  The receiving and ordering employee who was present at the time of delivery was not aware of the order and noted that the order of Ketamine was too large and unnecessary for Gupta's practice.  Thus, the employee informed the delivery person to return it to the manufacturer.  However, the employee later believed that Gupta may have placed the order.

50.  An employee of Dr. Gupta[8] stated that Versed is administered in 99% of surgeries to sedate patients and prevent them from having any memory of the procedure, while Ketamine, also considered to be an anesthesia drug, was rarely, if ever, used by Dr. Gupta in his practice, although a few bottles of it were kept on hand at the office.  This employee stated that the suppositories found in the bag were never used in their practice.  The bag also contained syringes and gloves that were the same as those used by Dr. Gupta at Artisan Cosmetic Surgery

51.  In 2019, Dr. Gupta's employees reported that Dr. Gupta travels to medical conferences every year and the locations change yearly, but have included Miami, Florida, Chicago, California (which one employee recalled was in 2016), Colorado, and Detroit.  In October 2019, Gupta traveled to Miami, Florida for another annual conference and was more recently in Chicago for a seminar on a new piece of skin tightening equipment.  Employees (and sometimes their spouses) occasionally accompanied Dr. Gupta on these trips.  For one of these trips, the employee was on the same flight as Gupta and recalled that Gupta had no bag with him other than a briefcase, which the employee found odd.

---

[8] All employees' identities are known but not disclosed herein.

Gupta asked this employee's spouse on one of these trips if the spouse wanted to play a game of 'who could spot the hooker first' in the room.

52.    A local Victim's Advocate for sex workers who has contacts throughout the country in this industry contacted other advocates throughout the country in an effort to identify other women who had been drugged, raped, and videotaped by Gupta.  On February 12, 2020, the State of Ohio Medical Board received a complaint that Gupta has been raping women for years.  On or about February 17, 2020, an unknown female caller reported to the Toledo Police Department (TPD) that Gupta has been drugging, raping, and videotaping women for years.  Neither of these complaints have been verified to date.

53.    Based upon the above information, a federal search warrant was executed on March 6, 2020 for Gupta's residence, two Lucas County medical offices, vehicle (Audi R8), cellular telephone, person, including the taking of a DNA standard, and all electronics at those places.

54.    While agents were in Gupta's home and seizing electronic devices he informed investigators that he uses Dropbox Plus, though claiming he could not remember his password.  Agents were able to notify Dropbox personnel at 8:30 a.m. and preserved the account by 9:00 a.m., after providing the criminal charges for which Gupta was being investigated.  The legal compliance team at Dropbox then provided reference number CR-9000-00625.  The email associated with this account is guptamd@gmail.com.  Gupta was using approximately 2.7% of his allotted 2TB of space in his Dropbox account, and it appeared as though there were 29 devices managed through this account.

55.    Gupta had his own private office at his Toledo medical practice on West Central Avenue. His private office was kept locked and only Gupta and the office manager had a key to it.

56.    In Gupta's private office at his Toledo medical practice, agents located a plastic bag containing sex toys (anal beads and vibrator), an "Anal Eaze Insertz" device, a package of "Lube Tubes," a syringe, several cameras/tripods, several loose SD cards, as well as an SD card inside one of the cameras, a plastic baggie of loose pills, Diazepam suppositories (prescribed by Gupta to a "Patil, Shanta" on 10/2/2014), and vials of Diazepam and Ketamine.  The vial of Ketamine was partly empty.  The label on the vial of Ketamine advised "For Slow Intravenous or Intramuscular Use."

18

57.     An employee who had been among those who observed the contents of Gupta's medical bag of sex toys, cameras, and drugs in the past identified the Diazepam suppositories as the same ones from before.  A nurse in Gupta's practice advised that they did not use Diazepam suppositories in their practice, nor would they have a need to insert anything into a patient's anus as part of their plastic surgery and cosmetic practice.

58.     Also located in Gupta's private office but separate and apart from the plastic bag described above were three handheld video-cam recorders, a tripod, additional sex toys (anal beads and another vibrator that was the same brand and packaging as the one in the plastic bag), a drawer full of additional SD cards, and a large amount of controlled substances, including Midazolam (Schedule IV benzodiazepine/sedative to relax patients before surgery), Diazepam (Schedule IV/benzodiazepine used for anxiety), and Ketamine (Schedule III drug used to assist anesthesia that induces a trance-like state while providing pain-relief, sedation, and memory loss).

59.     An employee advised that the controlled substances found in Gupta's private office should not have been kept in there but rather in the office's locked storage specifically for controlled substances.

60.     Also located in Gupta's private office was Sildenafil, marketed as Viagra, which is not controlled and which is used to treat erectile dysfunction.

61.     When agents viewed the contents of an SD card located in one of Gupta's cameras in his private office, they observed a video recording of Gupta having sex with an unidentified Caucasian woman who appeared to be unconscious in what appeared to be a hotel room. An anal lube shooter was observed at one point during the video.  The date displayed on the recording was December 17, 2019.

62.     Agents have since viewed many of the seized SD cards and other storage devices obtained at Gupta's medical office, which depict Gupta having sex with multiple women who appear to be in varying degrees of unconsciousness.  Several also depict Gupta administering narcotics into these women while unconscious, as well as using multiple cameras to capture said events.

63.     Based on the information contained herein, I believe probable cause exists that Gupta has violated 18 U.S.C. § 1591(a) and 21 U.S.C. §§ 841(a)(1) and (b)(7).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

64. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Dropbox to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

65. Based on the forgoing, I respectfully request that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

66. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a District Court of the United States that has jurisdiction over the offenses being investigated—namely, 18 U.S.C. § 1591(a) and 21 U.S.C. §§ 841(a)(1) and (b)(7).

Respectfully submitted,

Affiant/Special Erin L. Marciniak
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means per Fed. R. Crim. P. 4.1 and 41(d)(3), this 19th date of March, 2020.

Honorable James R. Knepp, II
United States Magistrate Judge

20